Karen P. MILLER, Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 90–2628.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 31, 1990.

Decided March 6, 1991.

Amended by order filed May 6, 1991.

Clifford John Shoemaker, Vienna, Va., for plaintiff-appellant.

Gill Paul Beck, Office of the Judge Advocate Gen., Dept. of the Army, Washington, D.C., argued (Henry E. Hudson, U.S. Atty., Robert C. Erickson, Asst. U.S. Atty., Alexandria, Va., on brief), for defendant-appellee.

Before POWELL, Associate Justice (Retired), U.S. Supreme Court, sitting by designation, and PHILLIPS and WILKINS, Circuit Judges.

PHILLIPS, Circuit Judge:

The question is whether a wrongful death action brought under the Federal Tort Claims Act, 28 U.S.C. § 1346, by Karen Miller as executrix of the estate of Milica Petzak against the United States, claiming medical malpractice by government doctors as the cause of Mrs. Petzak's death, was time-barred. The district court held that it was and dismissed the claim by summary judgment.

We conclude that under Virginia law, which defines the nature of the claim, and federal law which defines the limitations period and the time of the claim's accrual, the action was time-barred, and could not be saved here by a "continuous treatment" theory. We therefore affirm.

I

On June 1, 1983, Mrs. Petzak, a military dependent, went to see Dr. W. Lamar Bomar, a physician employed by the federal government, at the Rader Health Clinic in Ft. Myer, Virginia. At the time, Mrs. Petzak was concerned about urinary frequency, and pain in her toes, left hip, and lower back. Dr. Bomar gave Mrs. Petzak a physical, during which he noted that her breasts were "within normal limits." He did not order a mammogram for Mrs. Petzak. She returned to Dr. Bomar several times in 1983, but not for any problems related to breast cancer. By the fall of 1983, Mrs. Petzak noticed a change in her left breast. She set up an appointment for a mammogram in December 1983, but canceled it when her husband suffered a stroke.

While visiting her husband at Walter Reed Army Medical Center (WRAMC) on January 3, 1984, Mrs. Petzak consulted a physician there for treatment of a cold. At this time, she also asked the physician to give her a breast examination. He found a suspicious area in her left breast and referred her to a surgeon. Mrs. Petzak met with the surgeon during the third week in that January, and he referred her for a mammogram. She had the mammogram performed on February 16, 1984, and on February 22, doctors informed her that the mammogram showed cancer in her left breast. Mrs. Petzak then went to see Dr. Bomar for the last time on February 28, 1984. At that visit Dr. Bomar refilled one of Mrs. Petzak's prescriptions and noted that doctors had performed a mammogram on Mrs. Petzak. Mrs. Petzak then underwent a mastectomy at WRAMC on March 9, 1984, and Dr. Bomar did not participate any further in her treatment.

On March 8, 1984, one day before her mastectomy, Mrs. Petzak wrote a letter to her daughter, Karen Miller, in which she stated that she had the option of proceeding with her mastectomy as scheduled, or trying to keep her left breast by delaying the operation and undergoing radiation treatment. Mrs. Petzak wrote that she planned to go through with the surgery, explaining that "[r]ight now, I think delay may be a factor of first importance." In this same letter, Mrs. Petzak expressed doubts about her future, and gave her daughter instruction about what to do if she died. Joint Appendix at 202.

One month later, on April 8, 1984, Mrs. Petzak wrote in her notes that "On 1 June 83, I had a physical.... In retrospect, a mammogram should have been ordered [by Dr. Bomar]...." Joint Appendix at 145. Mrs. Petzak died two years and one day later, on April 9, 1986.

Miller, as Mrs. Petzak's executrix, commenced a wrongful death action against

the government under the FTCA on January 7, 1988, alleging that the negligence of government doctors in failing timely to diagnose her breast cancer proximately caused Mrs. Petzak's death. As indicated, the district court gave summary judgment for the government on the basis that the action was barred by the applicable two-year statute of limitations.

This appeal followed.

## II

A plaintiff has an FTCA cause of action against the government only if she would also have a cause of action under state law against a private person in like circumstances. 28 U.S.C. § 1346(b); *Corrigan v. United States*, 815 F.2d 954, 955 (4th Cir.1987). State law determines whether there is an underlying cause of action; but federal law defines the limitations period and determines when that cause of action accrued. *Washington v. United States*, 769 F.2d 1436, 1437–38 (9th Cir.1985). The limitations period under the FTCA is two years. 28 U.S.C. § 2401(b). A medical malpractice claim under the FTCA accrues when the claimant first knows of the existence of an injury and its cause. *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

Virginia's wrongful death statute does not create a new cause of action, but only a right of action in a personal representative to enforce the decedent's claim for any personal injury that caused death. *See* Va.Code § 8.01–50; *Grady v. Irvine*, 254 F.2d 224, 227 (4th Cir.1958).[1] For this reason, a wrongful death action under Virginia law is necessarily time-barred if at the time of the decedent's death her personal injury claim based on the tortious conduct that ultimately caused death is already time-barred. *Lawrence v. Craven Tire Co.*, 210 Va. 138, 169 S.E.2d 440, 441 (1969).

The government asserts here that Mrs. Petzak's claim for the personal injury that allegedly caused her death accrued no later than April 8, 1984, when she wrote in her notes that "[o]n 1 June 83, I had a physical.... In retrospect, a mammogram should have been ordered because of previous breast biopsies, family history, and post-menopausal age 59." Joint Appendix at 145. Thus, according to the government, by April 8, 1984, at the latest, Mrs. Petzak knew of her cancerous condition and believed that its then advanced state resulted from the failure of Dr. Bomar to have ordered a mammogram which would have detected it earlier. Because Mrs. Petzak died on April 9, 1986, the two-year statute of limitations by then already had run on any claim based on negligence in failing to make a timely diagnosis. It was on this basis that the district court dismissed the wrongful death action as time-barred.

On this appeal, Miller makes two principal arguments that her claim was not time-barred. First, she contends that Mrs. Petzak's personal injury claim accrued later than April 8, 1984, because at that time she did not know she was going to die, and in fact, by 1985 optimistically believed that she was cancer-free. Second, Miller argues that the continuous treatment doctrine applies to Mrs. Petzak's case. Under that theory, as applied here, because government doctors continued up until the date of Mrs. Petzak's death to treat her, the statute of limitations had not commenced to run at the time of her death.

We consider these two theories in turn.

### A

Although her executrix does not dispute that as of April 8, 1984, Mrs. Petzak realized that she had breast cancer that an early mammogram would have detected, she argues that Mrs. Petzak's claim could

---

1. Not only claims for personal injury resulting in "wrongful death" survive for enforcement by a personal representative under Virginia law, so do claims for personal injury that do not result in death. Va.Code § 8.01–25. The measure of damages for the two types of claim are different in important respects. *See Bagley v. Weaver*, 211 Va. 779, 180 S.E.2d 686, 689 (1971).

It is important to emphasize that, as pleaded and defended against summary judgment, the executrix's claim here is only for wrongful death. Appellant's Brief at 11.

not have accrued on that date because Mrs. Petzak did not then realize that the failure to make early diagnosis was going to cause her death. In support of this argument Miller asserts that in the spring of 1985, Mrs. Petzak in fact believed that she was cancer-free and was therefore optimistic about eventual recovery. From this, she contends that it would be "absurd" to expect Mrs. Petzak to file a malpractice action when she thought that she was cancer-free and was going to recover. She concludes from this that the claim could not have accrued until Mrs. Petzak realized that she was not cured.

There is some surface appeal to this argument, but it fails, as do many arguments against the seeming harshness of limitations defenses, in the face of the *Kubrick* first-discovery rule. Under *Kubrick*, a medical malpractice claim such as that here in issue accrues when a claimant first knows of an injury and its cause, and not only later when it is first realized that a particular legal claim may be maintainable in consequence of the injury. The question under *Kubrick* and Virginia wrongful death law in combination is not, therefore, whether at the critical time Mrs. Petzak knew that she had a personal injury that would eventually cause her death, but only whether she then knew that she had *an* injury and, as is now alleged, an injury caused by the failure of Dr. Bomar to have diagnosed her condition in time to prevent or minimize the injury that she indisputably then knew to exist.[2]

Unless the application of *Kubrick*'s first-discovery rule to the undisputed facts above summarized can somehow be avoided, the district court was correct in finding the action barred by Mrs. Petzak's discovery two years and a day before her death of the condition that finally caused her death, and of the cause of the condition in the failure to make timely diagnosis of its existence.

### B

■ As indicated, Mrs. Petzak's executrix seeks to avoid application of the *Kubrick* rule, by invoking the "continuous treatment" theory. Under that theory as applied by some courts, the statute of limitations does not begin to run on a medical malpractice claim upon a claimant's initial discovery of an injury and its cause so long as the claimant remains under the "continuous treatment" of a physician whose negligence is alleged to have caused the injury; in such circumstances, the claim only accrues when the "continuous treatment" ceases.

We are among the courts that have recognized and applied this theory, though it effectively trumps a rigid application of *Kubrick*'s first discovery rule. *See Otto v. Nat'l Institute of Health*, 815 F.2d 985 (4th Cir.1987). Our reason, and that of other courts applying the theory, is that a rigid application of the *Kubrick* rule can effectively deprive a medical patient of her "right to place trust and confidence in [her] physician"; and the solution is to excuse the patient "from challenging the quality of care being rendered until the confidential relationship terminates," *i.e.*, to toll the statute's running during this period. *Id.* at 988 (citing *Brown v. United States*, 353 F.2d 578, 580 (9th Cir.1965)).

The executrix of course relies on *Otto* as authority for tolling the statute's running here. Specifically, she contends that even if Dr. Bomar's treatment of Mrs. Petzak terminated on February 28, 1984, when she last saw him, his treatment should be considered "continuous" with that of other government doctors at WRAMC who negligently had failed to diagnose her cancer during earlier professional visits between 1972 and 1975, and still others who, following the eventual diagnosis of cancer in 1984, negligently treated her in a variety of ways. On this theory, the statute of limitations was tolled until treatment by the last

**2.** Actually, there was no evidence on the record before the district court that Mrs. Petzak thought she was cancer-free in 1985. Miller never presented any affidavits or depositions that would support this assertion. The only evidence of record indicates that Mrs. Petzak then knew that 21 of 21 lymph nodes tested positive for cancer, and she realized that the delay in diagnosing her cancer might cause her death.

of these government doctors ceased shortly before Mrs. Petzak's death, well within two years of this action's commencement in January of 1988.

This argument fails. The underlying rationale for the continuous treatment tolling theory demonstrates its inapplicability here.

In the first place, the fact that other doctors than Bomar may earlier have failed to diagnose cancer is irrelevant to the theory's application. Only treatment occurring after the critical date of April 8, 1984, when Mrs. Petzak plainly was aware of her condition, could operate to toll the statute's normal running from that date.

Equally unavailing are the assertions of later acts of negligence by government doctors other than Bomar—for two reasons. First, no such later negligence could have contributed to the specific cause of death upon which this wrongful death claim has throughout been rested: the failure to detect cancer in time to arrest it and thereby altogether avoid death from that cause. While the complaint contains conclusory allegations that could be read to charge the later treatments as contributory causes of death, the only later acts of negligence specifically identified in opposing the summary judgment motion have nothing to do with timely detection or arrest of the cancer which, so far as the record shows, was inexorably underway when Mrs. Petzak first became aware of its existence.[3] Equally important, as we and other courts have recognized, the rationale for this tolling theory only permits its application when the treatment at issue is for the same problem and by the same doctor, or that doctor's associates or other doctors operating under his direction. *See, e.g., Otto,* 815 F.2d at 988–89; *Page v. United States,* 729 F.2d 818, 823 n. 36 (D.C.Cir.1984); *Hulver v. United States,* 562 F.2d 1132, 1137 (8th Cir.1977); *Camire v. United States,* 535 F.2d 749, 750 (2d Cir.1976); *Ciccarone v. United States,* 486 F.2d 253, 257 (3d Cir. 1973); *Brown v. United States,* 353 F.2d 578, 580 (9th Cir.1965); *but see Accardi v. United States,* 356 F.Supp. 218, 221, 222 (S.D.N.Y.1973). As the Ninth Circuit has explained, "We cannot accept the proposition that one who continues to receive treatment from succeeding government physicians is, regardless of the circumstances, excused from conducting diligent inquiry into the conduct of a doctor with whom the personal relationship has been terminated and who is not claimed to have acted in direct concert with the succeeding physicians." *Brown,* 353 F.2d at 580 (9th Cir.1965). Reflecting that same perception of the theory's rationale, we were careful to note in *Otto* that although the claimant there received treatment from private physicians after her treatment by National Institute of Health (NIH) doctors, "that additional treatment was rendered at the advice and under the direction of the NIH physicians, to whom the private doctors consistently and repeatedly deferred." *Otto,* 815 F.2d at 989.

In contrast to the situation in *Otto,* the doctors at WRAMC whose "continuous treatment" is relied upon were not acting

---

**3.** There is a real question whether any evidence of later negligence than that charged to Dr. Bomar was properly before the district court. The only suggestion occurs in assertions made in the executrix's "Opposition to Defendant's Motion to Dismiss or in the Alternative for Summary Judgment." These were not supported by any evidentiary materials of the sort required by Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Even if the facts asserted had been properly before the court, however, they would not have raised genuine issues respecting the continuous treatment theory's application. None pertained to the "same problem" whose creation was charged to Dr. Bomar, *i.e.,* the failure to make diagnosis in time to arrest the cancer that was the alleged cause of death. Rather, it was asserted that WRAMC doctors later prescribed an excessive dosage of a drug which caused rupture of Mrs. Petzak's intestines; failed in treating her for hip and leg pain to discover by x-ray a fracture or, incidentally, the continued presence of cancer; and failed to detect another tumor on Mrs. Petzak's bronchial tube.

While these assertions of later negligent treatment, if properly presented, might have supported a survived action for personal injury not resulting in death, *see* note 1, *supra,* they have not been so advanced in this action. This action, as indicated, is solely for wrongful death resulting from the failure to make timely diagnosis of breast cancer.

"at the advice" or "under the direction" of Dr. Bomar. The rationale behind the continuous treatment doctrine as we apply it does not, therefore, support its application here.[4]

### III

In conclusion, we hold that this wrongful death claim based on failure to diagnose breast cancer in a timely manner accrued at the latest on April 8, 1984. The action commenced on January 7, 1988, is therefore barred by the FTCA's two-year statute of limitations. The district court's grant of summary judgment to the United States is accordingly affirmed.

AFFIRMED.

---

**4.** The executrix seeks to raise for the first time on this appeal a so-called "blameless ignorance" exception to the firstdiscovery rule. Under that exception, the statute of limitations may be tolled for any period during which a claimant is in a coma caused by the very tort alleged as the basis for a claim. *See Dundon v. United States,* 559 F.Supp. 469, 474 (E.D.N.Y.1983). The exec- utrix did not advance this theory nor support it with any proper proffer of evidence in the district court, and we may not consider it in the first instance on this appeal. In declining to do so, we intimate no view on the merits of the theory, nor on the circumstance under which any such tolling rule could apply if generally recognized.